UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

| | |
|---|---|
| PAMELA STAR CHAPMAN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No.: 5:23-cv-1066-LCB |
| | ) |
| SOCIAL SECURITY ADMINISTRATION, COMMISSIONER, | ) ) ) |
| | ) |
| Defendant. | |

### MEMORANDUM OPINION & ORDER

Pamela Star Chapman, filed a complaint seeking judicial review of an adverse decision of the Commissioner of the Social Security Administration ("the Commissioner") pursuant to 42 U.S.C. § 405(g). (Doc. 1). The Commissioner filed an answer and a copy of the administrative record. (Doc. 4). Both Chapman and the Commissioner have fully briefed the relevant issues, and Chapman's case is ripe for review. For the following reasons, the Commissioner's final decision is due to be affirmed.

**I.    Background**

Chapman protectively filed an application for a period of disability and disability insurance benefits on January 19, 2021, alleging disability beginning January 15, 2017. The claim was denied initially on January 26, 2022, and upon

reconsideration on May 26, 2022. Chapman then requested a hearing before an Administrative Law Judge ("ALJ"), which was held on October 17, 2022. Chapman testified at the hearing, as did an impartial vocational expert ("VE"). The ALJ subsequently issued an unfavorable decision. The Appeals Council denied Chapman's request for review, and the ALJ's decision became the Commissioner's final decision. This lawsuit followed.

## II. The ALJ's decision

After the hearing, the ALJ issued a written opinion explaining her decision. (Tr. at 22-33). In issuing her decision, the ALJ followed the five-step evaluation process set out by the Social Security Administration. *See* 20 CFR 416.920(a). The steps are followed in order and, if it is determined that the claimant is or is not disabled at a particular step of the evaluation process, the ALJ will not proceed to the next step.

The first step requires the ALJ to determine whether the claimant is engaging in substantial gainful activity, which is defined as work involving significant physical or mental activities usually done for pay or profit. If a claimant is engaged in substantial gainful activity, she is not disabled, and the inquiry stops. Otherwise, the ALJ will proceed to step two. In the present case, the ALJ found that Chapman did not engage in substantial gainful activity during the relevant time period. (Tr. at 25). Accordingly, the ALJ moved on to the second step of the evaluation.

At step two, an ALJ is to determine whether the claimant has a medically determinable impairment that is "severe" or a combination of impairments that is "severe." 20 CFR 416.920(c). An impairment is severe if it "significantly limits [a claimant's] physical or mental ability to do basic work activities…." *Id*. If a claimant does not have a severe impairment, she is not disabled, and the inquiry ends. If she does have a severe impairment, the ALJ will proceed to the third step. In the present case, the ALJ found that Chapman had the following severe impairments: chronic liver disease/cirrhosis of the liver, type II diabetes mellitus, peripheral neuropathy, obesity, hernias, portal vein thrombosis, depressive/bipolar disorder, and anxiety/obsessive-compulsive disorder (OCD). (Tr. at 25), citing 20 CFR 404.1520(c).

At the third step, an ALJ determines whether the claimant's impairments or combination thereof are of a severity to meet or medically equal the criteria of an impairment listed in 20 CFR Part 404, Subpart P, Appendix I. If the claimant's impairment or impairments meet or equal a listed impairment, then the claimant is disabled, and the evaluation ends. Otherwise, the ALJ proceeds to the next step. In this case, the ALJ found that Chapman's impairments did not meet or equal any of the listed criteria. Specifically, the ALJ reviewed listings 5.05 chronic liver disease, 7.08 disorders of thrombosis and hemostasis, 9.00 endocrine disorders, and 11.14

peripheral neuropathy.[1]  After reviewing the evidence, the ALJ concluded that there was "no evidence including diagnostic tests that showed the requisite symptoms needed in order to meet these listings." (Tr. at 25).  Therefore, the ALJ proceeded to step four.

Step four of the evaluation requires an ALJ to first determine the claimant's residual functional capacity ("RFC"), and whether she has the RFC to perform the requirements of any past relevant work. 20 CFR 416.920(f).  The term "past relevant work" means work performed within the last 15 years prior to the alleged date of onset.  If a claimant has the RFC to perform past relevant work, she is not disabled, and the evaluation stops.  Otherwise, the evaluation proceeds to the final step.  In Chapman's case, the ALJ found that she had the following RFC:

> claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except the claimant can lift and carry twenty pounds occasionally and ten pounds frequently. The claimant can stand and/or walk with normal breaks for four hours in an eight-hour workday. She can sit with normal breaks for six hours in an eight-hour workday. The claimant can occasionally climb ramps and stairs, but she can never climb ladders, ropes, or scaffolds. The claimant can frequently balance on level terrain, but she can only occasionally stoop, kneel, crouch, and crawl. The claimant cannot work at or around hazards such as hazardous moving unguarded machinery and unprotected heights. The claimant can understand, remember, and carry out simple instructions and tasks. She can attend and concentrate for two-hour periods sufficient to complete an eight-hour workday. The claimant can frequently interact with coworkers, supervisors, and the

---

[1] The ALJ also reviewed the relevant listings for Chapman's alleged mental impairments and found that the evidence did not meet or equal any of those listings.  However, Chapman does not challenge those findings in this case.

general public. The claimant can adapt to occasional workplace changes.

(Tr. at 26-27). Given this RFC, the ALJ determined that Chapman was unable to perform her past relevant work as a commercial cleaner, dispatcher, or a non-house security guard. However, considering her age, education, work experience, and residual functional capacity, the ALJ found that there are jobs existing in significant numbers in the national economy that Chapman can perform. (Tr. at 32). Specifically, the ALJ accepted the VE's testimony that an individual with Chapman's RFC could perform light, unskilled jobs such as that of a ticket taker, an office helper, or a library clerk. According to the VE, those jobs exist in sufficient number in the national economy. (Tr. 74-75).

Based on the findings above, the ALJ determined that Chapman was not disabled as defined by the Social Security Administration. (Tr. at 32-33).

### III. Standard of Review

This Court must determine whether the Commissioner's decision is supported by substantial evidence and whether the correct legal standards were applied. *Winschel v. Comm'r of Social Sec.*, 631 F.3d 1176, 1178 (11th Cir. 2011). "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." Id. (internal citation and quotation marks omitted). "This limited review precludes deciding the facts anew, making credibility determinations, or re-weighing the evidence." *Moore*

5

*v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005). Thus, while the Court must scrutinize the record as a whole, the Court must affirm if the decision is supported by substantial evidence, even if the evidence preponderates against the Commissioner's findings. *Henry v. Comm'r of Soc. Sec.*, 802 F.3d 1264 (11th Cir. 2015); *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983).

## IV. Chapman's arguments

In her briefing to this Court, Chapman raises two arguments. First, she argues that the ALJ erred by failing to perform a certain calculation, the SSA Chronic Liver Disease Score ("SSA CLD Score") laid out in Listing 5.05(G). According to Chapman, it is mandatory that the calculation be done and that it be performed by an expert. Second, Chapman argues that the ALJ's decision is not supported by substantial evidence. The Court will address each argument in turn.

### A. SSA Chronic Liver Disease Calculation

Listing 5.05(G) is met when a claimant has "[t]wo SSA CLD scores (see 5.00C3) of at least 20 within a consecutive 12–month period and at least 60 days apart." 20 C.F.R. § Pt. 404, Subpt. P, App. 1. An SSA CLD is computed by plugging up to four laboratory values, serum creatinine (mg/dL), total bilirubin (mg/dL), INR, and under certain conditions, serum sodium (mmol/L) into a formula defined in the Listings. According to Chapman, the ALJ's statement that there were "insufficient findings on examination or diagnostic work-up to confirm the presence of an

6

impairment or combination of impairments which meets or equals in severity the criteria of any listing" was deficient because she did not specifically discuss any of the laboratory values required to compute an SSA CLD score. According to Chapman, an SSA CLD calculation is mandatory. (Doc. 6 at 7).

Chapman asserts that SSA CLD score calculations are "extremely complex requiring the use of a 'base e logarithm'[2] and multiple calculations based on serum total bilirubin, serum creatine, and International Normalized Ratio." *Id.* at 8. She also contends that there "are multiple complex subparts to this complex calculation." *Id.* Therefore, Chapman says, it would require an expert to perform the calculation. She points out that the Disability Determination physicians were a pediatrician and an internist, and states that there is no evidence that either physician had the expertise to perform the SSA CLD calculation.

The Court first notes that Chapman cites no authority for the proposition that an SSA CLD score must be in the record and considered by the ALJ in all cases involving liver disease. Chapman similarly cites no authority for the proposition that an SSA CLD score must be calculated by an expert. In her brief, Chapman cites *Todd v. Heckler*, 736 F.2d 641, 642 (11th Cir. 1984), in which the Eleventh Circuit discussed held:

---

[2] A "base e logarithm" is also known as the natural logarithm and is often denoted as "ln" or "$\log_e$" on calculators.

> "Evidence in the record suggests that Todd meets the subjective requirements of Listing 4.04.  However, while there are several pages of electrocardiogram reports in the record, the doctors did not correlate these tests to the terms used in the listing.  Todd was represented by a paralegal before the Administrative Law Judge.  The ALJ has a duty to develop the facts fully and fairly.  The ALJ failed to fulfill this duty when he did not ask the physicians to compare their electrocardiogram results with the readings included in the listing."

(Doc. 6 at 12).  She also cites *Cannon v. Bowen*, 858 F.2d 1541, 1545 (11th Cir. 1988) for a similar proposition.

However, those cases are distinguishable because each discussed findings and reports that required interpretation.  The SSA CLD score requires no interpretation—it is simply a computation—and is not as complex as Chapman contends.  The calculation is set out in the listings as follows:

> We calculate the SSA CLD score using a formula that includes up to four laboratory values: Serum creatinine (mg/dL), total bilirubin (mg/dL), INR, and under certain conditions, serum sodium (mmol/L). The SSA CLD score calculation contains at least one, and sometimes two, parts, as described in (i) and (ii).
>
> (i)   The initial calculation is:
>
> SSA $CLD_i$ =
>
> 9.57 x [$\log_e$(serum creatinine mg/dL)]
>
> + 3.78 x [$\log_e$(serum total bilirubin mg/dL)]
>
> +11.2 x [$\log_e$(INR)]
>
> + 6.43
>
> rounded to the nearest whole integer.

(ii) If the value from the initial calculation is 11 or below, the SSA CLD score will be the SSA $CLD_i$ value. If the value from the initial calculation is greater than 11, the SSA CLD score will be re-calculated as:

SSA CLD =

SSA $CLD_i$

+ 1.32 x (137 - serum sodium mmol/L)

-[0.033 x SSA $CLD_i$ x (137 - serum sodium mmol/L)]

(ii) We round the results of your SSA CLD score calculation to the nearest whole integer to arrive at your SSA CLD score.

20 C.F.R. § Pt. 404, Subpt. P, App. 1.  Among other requirements, the Listings require that the laboratory values used in the calculation be obtained within a continuous 30-day period.  While the formula may appear complex at first glance, it is nothing more than a simple algebraic calculation that can be done on a standard scientific calculator.  It requires no interpretation and involves nothing more than plugging the relevant laboratory values into the formula and computing the results with a calculator.

While Chapman does not contend that her records contain laboratory values that would yield the requisite SSA CLD scores, she does point to a few results in her brief.  For example, she notes that "on September 3, 2020, there are bilirubin scores that are designated as abnormal and high at '2.4'. [Tr. at 1097].  On June 17, 2020,

9

the bilirubin is high at '5.1' and the BUN/Creation (sic)[3] score is '10'. [Tr. at 1107]. On October 11, 2021, there is an abnormal total bilirubin score of '1.7' and an INR score of '1.33' with multiple other abnormal laboratory values. [Tr. at 1225]. On August 4, 2021, there are also multiple abnormal laboratory scores including an abnormal total bilirubin score of '1.9'. [Tr. at 1238]." (Doc. 6 at 9-10). However, these are not all of the values required to compute an SSA CLD score, and they were not collected within a 30-day period.

Nevertheless, the Court has searched the record and did find a set of laboratory values collected on February 18th and 19th of 2023 that could be used to compute an SSA CLD score. (Tr. 190). That record indicates that Chapman had the following values: serum creatinine = 0.9 mg/dL; total bilirubin = 4.0 mg/dL; INR = 1.6; and serum sodium = 136 mmol/L. Plugging those values into the formula above gives the following:

- SSA $CLD_i$ = 9.57 x [$\log_e(0.9)$] + 3.78 x [$\log_e(4.0)$] + 11.2 x [$\log_e(1.6)$] + 6.43

- Computing the natural logarithms gives the following:

    o SSA $CLD_i$ = 9.57 x [-0.1054] + 3.78 x [1.3863] +11.2 x [0.47] + 6.43

---

[3] The Court notes that the BUN/creatinine laboratory value Chapman cites is not the same as serum creatinine, the value used in calculating the SSA CLD score. BUN/creatinine is a ratio of blood urea nitrogen ("BUN") to serum creatinine. While serum creatinine is a component of the BUN/creatinine laboratory value, it is not the same. On the date Chapman cites in her brief, her BUN was 9 mg/dL (Tr. at 1107), and her serum creatinine was 0.92 mg/dL (Tr. at 1108). Therefore, her BUN/creatinine value was equal to 9/0.92 mg/dL or 9.78 mg/dL, which was rounded to the reported value of 10.

- Performing the multiplication and addition yields:
    - SSA $CLD_i$ = -1.0087 + 5.2402 + 5.264 + 6.43 = 15.92

Rounding to the nearest integer gives an SSA $CLD_i$ score of 16. Because the SSA $CLD_i$ score is greater than 11, we proceed to the second calculation using the serum sodium laboratory value of 136 mmol/dL:

- SSA CLD = SSA $CLD_i$ + 1.32 x (137 - serum sodium mmol/L) - [0.033 x SSA $CLD_i$ x (137 - serum sodium mmol/L)]

- SSA CLD = 16 + 1.32 x (137-136) – [0.033 x 16 x (137-136)]

- SSA CLD = 16 + 1.32 – 0.528 = 16.792

Rounding that to the nearest integer gives an SSA CLD score of 17, which does not meet Listing 5.05(G). Even searching the entirety of Chapman's medical records and performing the same calculation using the laboratory values that would yield the highest SSA CLD score, i.e., the highest values for serum creatinine, total bilirubin, and INR and the lowest value for serum sodium[4], only yields an SSA CLD score of 18, which is still below the requirement to meet Listing 5.05(G)[5].

---

[4] Given the second formula for when the SSA $CLD_i$ is greater than 11, an increasing serum sodium value would yield a lower SSA CLD score.

[5] The Court did this calculation for illustrative purposes only. Those values were not obtained within a 30-day period as required by the relevant Listing. *See* 20 C.F.R. § Pt. 404, Subpt. P, App. 1 ("For any SSA CLD score calculation, all of the required laboratory values (serum creatinine, serum total bilirubin, INR, and serum sodium) must have been obtained within a continuous 30–day period.").

Accordingly, the ALJ's statement that she reviewed the medical evidence and found that "there are insufficient findings on examination or diagnostic work-up to confirm the presence of an impairment or combination of impairments, which meet or equal in severity the criteria of any listing" is supported by substantial evidence. The Court notes that Chapman also cited to other diagnostic findings including various Model End-Stage Liver Disease ("MELD") scores. However, none of those findings are relevant for Listing 5.05(G).

## B. Substantial Evidence

While maintaining that this Court should reverse and remand this case to perform the SSA CLD calculation, Chapman also contends that the ALJ's reasons supporting her denial are not supported by substantial evidence. The Court will address each of Chapman's arguments in turn.

Chapman first points to the ALJ's finding that "[Chapman] underwent an upper gastrointestinal endoscopy with biopsy that showed cirrhosis of the liver without ascites and no dominant mass." (Doc. 6 at 14) citing (Tr. 28). According to Chapman that finding improperly joins the results of two separate tests, an upper GI endoscopy and an ultrasound. Having reviewed the medical records in question, Chapman is correct in noting that it was an ultrasound that revealed "cirrhosis of the liver without ascites and no dominant mass" and not an endoscopy. *See* (Tr. 610-617). However, she does not challenge the findings themselves.

12

"Ascites … is a pathologic accumulation of fluid in the peritoneal cavity…." 20 C.F.R. § Pt. 404, Subpt. P, App. 1. When severe, the condition can cause pain. Accordingly, the absence of ascites is substantial evidence that Chapman's "statements concerning the intensity, persistence and limiting effects of [her] symptoms are not entirely consistent with the medical evidence…." (Tr. 27). Similarly, the ALJ's finding that there was "no dominant mass" supports her decision. In her brief, Chapman appears to argue that the ALJ's discussion of the mass somehow related to a previous diagnosis of colon cancer. According to Chapman, she "has never contended that the colon cancer has spread to her liver and while the physicians do search for evidence of that possibility, there is no indication that a 'dominant mass' or a lack of a dominant mass has any relationship to the end stage liver failure the Plaintiff suffers." (Doc. 6 at 14). But the medical record indicates that the absence of a dominant mass was found during an ultrasound of Chapman's liver, not her colon. Therefore, Chapman's argument is belied by the record. The ALJ's finding regarding the absence of a mass is substantial evidence supporting her decision.

Chapman next points to the ALJ's finding regarding her use of the medication Lactulose. The records indicate that Chapman was prescribed that medication to help ameliorate her forgetfulness caused by a buildup of ammonia in her blood. The ALJ noted that Chapman's records indicated those symptoms improved after she

started taking the medication. In her brief, Chapman agrees that her symptoms improved but noted that they did not go away completely. Therefore, she says, the ALJ's use of that fact is not substantial evidence that her symptoms were not as intense or persistent as she claimed. That argument makes little sense. The ALJ never found that Chapman's symptoms went away; only that they improved with the medication and, therefore, were not as severe or persistent as Chapman claimed. Chapman appears to admit as much in her brief, *see* (Doc. 6 at 15), and is therefore entitled to no relief on this issue.

 Chapman next challenges the ALJ's finding that she "was allegedly told that she had an enlarged liver and spleen, but on examination, it was found that her liver and spleen were not enlarged." (Tr. 28). According to Chapman, this finding is a reference to a January 31, 2022 examination where a doctor noted: "Abdomen: Soft, mildly tender in epigastric and RLQ. Liver and spleen are not enlarged (difficult to palpate due to obesity)." (Tr. at 1202). Chapman then states: "As can be seen, the examination findings were themselves questioned by the physician conducting the examination as a proper examination could not be performed due to the Plaintiff's obesity." (Doc. 6 at 16). But the physician did not say a proper examination was impossible; only that it was difficult. Chapman also correctly points out that several imaging studies indicated that her spleen and liver were enlarged. Therefore, she says, the ALJ's use of the January 31, 2022 examination in her decision was not

14

supported by substantial evidence. The Court disagrees. Having an enlarged spleen or liver detectable in sensitive imaging studies is not the same as having a spleen or liver so enlarged that it can be detected by palpation. The latter would be a much more severe condition that would lend support to Chapman's statements about the intensity of her pain. Thus, the fact that her spleen was not so enlarged as to be detectable by palpation is substantial evidence supporting the ALJ's decision.

Chapman also argues that the ALJ's finding regarding her spleen was not supported by substantial evidence because she did not discuss that Chapman developed thrombocytopenia due to her enlarged spleen. As Chapman correctly notes in her brief, thrombocytopenia is characterized by a low number of platelets in the blood potentially leading to difficulty forming clots. However, an ALJ is not required to specifically discuss every single diagnosis in a patient's medical records. The Eleventh Circuit has held that "there is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision, so long as the ALJ's decision, as was not the case here, is not a broad rejection which is 'not enough to enable [the district court or this Court] to conclude that [the ALJ] considered her medical condition as a whole.' *Foote v. Chater*, 67 F.3d 1553, 561 (internal quotation omitted). Our standard of review is, as it is for the district court, whether the ALJ's conclusion as a whole was supported by substantial evidence in the record." *Dyer v. Barnhart*, 395 F.3d 1206, 1211 (11th Cir. 2005). The Court notes

that none of Chapman's testimony at her hearing suggested that an inability to properly form blood clots significantly contributed to her alleged inability to work. Accordingly, it was not reversible error for the ALJ to omit specific discussion of Chapman's thrombocytopenia.

Chapman next points to the ALJ's discussion of her ECOG score as evidence for denying benefits. Specifically, the ALJ noted that Chapman's "ECOG score was repeatedly found to be one, which indicated that she was restricted in physically strenuous activity, but ambulatory and able to carry out work of a light or sedentary nature." (Tr. at 28). As noted in Chapman's medical records, the ECOG Performance Status Scale "describes a patient's level of functioning in terms of their ability to care for themselves, daily activity, and physical ability (walking, working, etc.)." (Tr. at 389). According to Chapman, the ECOG "is not a scale to measure the limitations caused by non-cancer medical conditions or by non-cancer medical treatment." (Doc. 6 at 19), citing (Tr. at 389). However, the cited page in Chapman's brief is to a printout from a website describing the ECOG Scale. While that particular website discusses the scale in the context of assessing patients participating in clinical trials for cancer treatments, it does not suggest that the scale cannot be used to assess functionality for other conditions. Rather, it notes that the scale is publicly available and is one of several such tests for assessing a patient's "level of functioning in terms of their ability to care for themsel[ves], daily activity,

and physical ability (walking, working, etc.)." (Tr. at 389). Thus, Chapman's contention that the ALJ's use of her ECOG score is somehow improper is not supported by the record. To the contrary, the ECOG score is substantial evidence that Chapman's limitations were not as severe as she contended.

Finally, Chapman points to the ALJ's finding that she stopped taking the drug Eliquis. Specifically, Chapman contends the ALJ's finding that she "admitted that she had stopped taking Eliquis" implied that she was not credible or improperly stopped taking her medication. According to Chapman, she discontinued use of the drug at the direction of one of her doctors.

The Court does not read the ALJ's language the same way. In reviewing the records cited by the ALJ in making that finding, the Court finds that Chapman is correct in asserting that she stopped taking Eliquis at the direction of a physician. (Tr. 1281). While the ALJ's use of the word "admitted" may have sounded like she was taking a stance on Chapman's credibility, the records she cited in support of that finding make clear that Chapman stopped the medication at the direction of her doctor. Thus, there is no error in the finding. Moreover, Chapman does not assert that she is currently taking the medication, nor does she argue that the fact she is no longer taking it fails to constitute substantial evidence supporting the ALJ's finding.

## V. Conclusion

For the foregoing reasons, the Commissioner's decision is **AFFIRMED**.

**DONE** and **ORDERED** January 21, 2025.

_____
**LILES C. BURKE**
UNITED STATES DISTRICT JUDGE